Reese, J.
delivered the opinion of the court.
This is an action of covenant upon a policy of insurance upon one hundred and one hogsheads of tobacco, shipped on a flat-boat from Smith county, Tennessee, to New Orleans, to recover for seventy-six hogsheads alleged to have been lost by one of the perils insured against.
The declaration contains two counts. The first count states that the flat-bSat while pursuing her voyage on the Mississippi river encountered a steam-boat called theRe venue, and was materially damaged and injured, which caused her to leak so badly that she had to run ashore, where she sunk, and seventy-six hogsheads of tobacco were wholly lost.
The second count, in addition to the injury done to the flatboat, states that the collision with the Revenue injured the master of the flat-boat and two of the hands so much that they, with the hands left, were unable to carry the boat to New Orleans without towing; and avers that the master examined with care the nature of the injury sustained by the boat, and believed that it could be safely towed to New Orleans, and being unable to procure hands to navigate her, hired the steam-boat Mississippi to tow her down to New Orleans; but before she had, so being towed, proceeded very far, she was found to be sinking in consequence of the injury received from the Revenue, was run ashore, and seventy-six, part of the one hundred and one hogsheads of tobacco, were, wholly lost.
A number of pleas were filed, a portion of which only we deem it- necessary to notice.
The third plea alleges that after the collision with the Revenue the plaintiffs could have procured, but did not procure, another master and crew, and the boat could have been repaired and rendered sea worthy, but was not; and the cargo could have been safely delivered at New Orleans, but was not, on account of the fault of the plaintiffs and their agents.
The plaintiffs, for replication to this plea, allege that after the accident of collision, a competent master and crew could not have been procured to conduct the boat to New Orleans; and, as to repairing her, they aver the reason why, after sus- *244 taming the injury, she was not repaired, was that the mas-careful examination, in good faith believed that no repah's were necessary except stopping the breaks and holes pr0(jucedby the concussion, which was properly done.
To this replication the defendant filed a demurrer.
The fifth plea alleges that after the concussion with the Revenue, the master of the flat-boat, improperly and contrary to the usual mode of navigating flat-boats, caused the flatboat to be lashed to the steam-boat Mississippi to be towed, and thereby changed the perils against which the defendant had insured, after all which the cargo sustained the damage complained of;
The replication to this plea is, that the produce did not sustain the damage complained of after and in consequence of the boat having been lashed to the Mississippi. To this replication there is a demurrer.
The tenth plea, drawn out in much detail, states that after the concussion the master omitted and refused to land and repair the boat, but sailed on to Vicksburg; that on his arrival at Vicksburg he omitted to secure the cargo, then but little injured, omitted to repair the boat, which ought to have been done, and to proceed on his voyage in the usual mode, but transhipping twenty-five hogsheads on board the Mississippi steam-boat, caused the boat, in a leaky condition, to be lashed to and to be towed by said steam-boat, and when compelled to run the boat ashore good care and proper pains as to the preservation of the cargo were not taken by the plaintiffs’ agents, the master and crew; and so the defendant avers tliat the cargo was Ipst from the carelessness, un-skilftdness and mismanagement of the master and crew.
For replication to this plea, the plaintiffs alleged that after the concussion the*master did diligently examine the injury which the flat-boat had sustained, and in good faith thought that the injury was not so great as to require repairing, and he accordingly proceeded with said boat to Vicksburg; and when arrived at Vicksburg the said master again examined said boat, took off twenty-five hogsheads of tobacco, and in good faith believed that said boat could be towed to New Orleans, and did accordingly lash her to the steam-boat; and that *245 afterwards, to prevent her from sinking from the injury received in the concussion, she was run ashore, and the co lost from the concussion aforesaid, and not from carelessness, negligence, (fee. of the master and crew.
To this replication the defendant filed a rejoinder, to which the plaintiffs demurred.
The thirteenth plea alleges that the shock and concussion produced by the Revenue with the flat-boat did not so injure the latter and the master and hands thereof as that they, with the rest of the hands left, were unable to carry the boat to New Orleans without towing.
For replication to this plea, the plaintiffs state that the loss sustained by the tobacco in the declaration complained of was caused by the shock and concussion produced by said flat-boat and said steam-boat meeting, whereby said flat-boat sprung a leak, and was for that cause necessarily run ashore. To this replication the defendant demurred.
All these demurrers were sustained in the circuit courts, and judgment given for the defendant that it should go thence without day, &c. To reverse which judgment, the plaintiffs have prosecuted a writ of error to this court.
From the facts and allegations in the above recited pleadings three general questions arise for our consideration. 1. After the occurrence of a peril insured against, not of a character to produce immediate loss, what effect upon the rights of the parties is produced by the mistakes, the want of skill, care and attention of the master and crew in omitting to repair the boat, to procure another, or to secure the cargo by re-shipment or otherwise? 2. Was the lashing the flat-boat, With so large a portion of the cargo on board, to the steamboat Mississippi, to be towed from Vicksburg to New Orleans, an act changing the risk, and under the circumstances, amounting to a deviation? 3. What effect upon the state of the question, in view of the true grounds above stated, has the fact that in the policy before us there is an insurance against barratry?
1. In the question first stated is involved the inquiry whether the master and crew are the agents of the owner, or of *246 the underwriters, or of both? Upon this point it is stated in Goix vs. Low, 1 John. Cases, 345, by Mr. Justice Kent, that “the insurers are not liable for the losses arising from the mis-ta]ies 0f the owner or master.” It is elsewhere stated as a principle that the assured is in general not entitled to indemnity for the faults and negligence of the master and crew, and the question between him and the underwriters in this respect is the same that it would be between two sets of underwriters, of whom one should insure against the usual perils and the other against the mistakes, negligence and un-skilfulness of the master and crew, the assured being considered in all cases to be his own underwriter in respect to all risks not insured against in the policy. 1 Philips on Insurance, 226.
It is admitted by the counsel for the plaintiffs that in general the master and crew are agents of the assured and not of the insurers. But they contend that after the property has encountered one of the perils insured against, the master and crew become the agents of the underwriters, or rather of all parties interested.
It is true that when such peril has been encountered and the property insured is in imminent danger of immediate loss, the master does act for all concerned, and may be said to be the agent of the underwriters as well as of the owners, and the steps which he takes, under the guidance of his best judgment, during the continuance of this extraordinary state of things, for the preservation of the cargo and vessel, though ill-judged and erroneous, as it is for the benefit of all, the underwriters will not be permitted to make it the ground of their discharge.
If, for example, in the present case, the immediate danger to the flat-boat and cargo from the concussion with the steamboat Revenue had been greater than it was, and with a view to prevent the loss of the boat and cargo it had been lashed to the Revenue for the purpose of being towed to the nearest landing, although such lashing and towing might have enhanced the danger or even contributed to the loss, such act of the master, honestly intended under such circumstan *247 ces for the benefit of all, would not exonerate the insurers from liability. But in case of the slight danger which actually existed, unattended with any extraordinary risk, and when the boat, although injured, was able to sail and did sail to the port of Yicksburg, it was the duty of the master, as the agent of the owners, to have caused, at least at Yicks-burg, proper repairs to have been made to his boat, and if that could not have been done to have re-shipped the cargo on some other boat.
In the case of Schieffelin vs. The New York Insurance Company, Kent J. says: “if the captain has other means to forward the cargo and save the voyage and earn the freight, he ought to do it. What may be done ought to be done when the rights of third persons are essentially concerned in the act. He is the agent of the insured until an actual and valid abandonment, and they ought to bear the consequences of his neglect if the voyage be thereby lost, unless barratry be the cause of that neglect.” And he refers to a case tried before Lord Ellenborough, (2 Camp. N. P. 623,) where the insurance was upon a cargo of wheat from London to Lisbon, and the ship was disabled after the voyage had begun, and could not be repaired except at a cost greater than her entire value; but it appearing that there was another vessel lying at Hover, where the injured ship lay, in which the cargo might have been forwarded, his lordship held that the plaintiff could not recover.
Again, in the same case, Kent, J. lays it down as a general rule that the “plaintiff’ must make it appear that the voyage was lost by a peril within the policy;” and he adds “it is not lost as to the ship if the master has the means to repair her, nor as to the cargo and freight, if he has the means to send on the one and to earn the other.” So also in the case of Paddock vs. Franklin Insurance Company, 11 Pick. 227, Shaw, J. says, “there can be no doubt that after the vessel has met with such accidents, disasters and losses as to weaken and disable her and render her incapable of proceeding with reasonable safety, it is the duty of the owner to procure the necessary repairs as soon and as effectually *248 as he can reasonably do so under the circumstances in which ship is placed. If in a remote sea, or on a desolate or sarage island, a temporary expedient, however inadequate to Wants of the ship, must be sufficient, being the best which can be resorted to. But if the vessel, in such a condition, make a port where repairs can be obtained, and leaves such port without obtaining them, it is a fault and an instance of negligence on the part of the owner, who will have no claim upon his underwriters for losses which may be attributable to the insufficiency of the ship, and cannot be clearly traced to some independent and wholly distinct cause.
Upon this branch of the case we have been referred to the case of Waters vs. The Merchants Louisville Insurance Company, 11 Peters’ Rep. 220, and to cases in England according therewith.
These cases discuss a much disputed question, namely, where fire or other peril insured against is the proximate and immediate cause of the destruction of the property insured, whether it can be held to discharge the underwriters, if they show that more care and vigilance on the part of the owner or his agents might have prevented the incidence of the peril, or even that negligence or mismanagement on their part brought on the peril. • These authorities hold that the underwriters are not, upon such grounds, to be discharged. It is not material in the present case that we should inquire on which side of this conflict we may suppose the greater weight of reason and authority is to be found. There seems to be much force in the view of Mr. Justice Story as to the question in dispute.
But that is not the question before us. The question here is not as to the negligence of the owner or his agents before or at the incidence of the peril, but we have a case where the peril did not destroy but merely injured and endangered the vessel containing thé cargo insured, and where the injury suffered was in its nature and under the circumstances repayable, but not in fact repaired, from the mistake, inattention or ignorance of the agent or owner. This forms a distinct and totally different, case, and there is nothing to be *249 found in the cases referred to in conflict with the views whidh we have expressed or the authorities which we have cited and relied on.
The vessel might have been repaired at Vicksburg but was not, because the master deemed the injury so slight as not to make it necessary. The cargo, it is probable, might, the whole of it, have been shipped on board the Mississippi, as a part in fact was, but the master thought it not necessary; for the consequences of his ignorance, mistakes and negligence in these respects, the owners, his principals, must suffer, and not the underwriters.
2. We are to enquire whether the lashing of the flat-boat, with so large a portion of the cargo on board, to the steamboat Mississippi to be towed from Vicksburg, was an act changing the risk, and under the circumstances, amounting to a deviation? It is averred in the pleas that the towing of flatboats by steam-boats is not according to the usual course and mode of navigation. Anff it is admitted in argument that if the boat, before the injury received, had been then towed, the risk would have been not only changed but enhanced, and the underwriters would have been discharged; and it would seem that, in the natural situation of the boat after the injury, the risk from such changed mode of navigating her would have been still greater.
We have already said that if after the occurrence of the accident it had been deemed necessary to tow her to the first convenient landing or port, for the purpose of reparation or re-shipment, it would have been very proper and would not have amounted to a deviation. But, for the purpose of prosecuting so large a portion of the voyage as” that intervening between Vicksburg and New Orleans, to lash a flat-boat to a steam-boat is certainly a deviation, and the rather, after the injury produced by the peril referred to.
We have no doubt that in point of fact the risk was by these means increased, but it is not necessary that it should be shown to have been so; it is sufficient if it were changed. The supreme court of the United States, in the case of Maryland Insurance Co. vs. Levy and others, upon this subject *250 says: “that the discharge of the underwriters from their liability in such cases depends not upon any supposed increase of risk, but wholly on the departure of the insured from the contract of insurance. The consequences of such violation of the contract are immaterial to its legal effect, as it is, per se, a discharge of the underwriters, and the law attaches no importance to the degree in cases of voluntary deviation,, Necessity alone can sanction a deviation in any case, and that deviation must be strictly commensurate with the vis. major producing it.” 7 Cranch’s Rep. 30.
3. As the policy in this case contains a clause of insurance against barratry, what effect has that upon the question of the liability of the owners for the negligence of the master in not repairing the boat, in not re-shipping the cargo, or in being guilty of a deviation in lashing the boat with her cargo to the steam-boat to be towed?
As to the true meaning of the word barratry there seems to be much dispute between the continental writers and those of England and America. In the latter countries, however, it is held to mean the, wrongful, injurious and fraudulent conduct of the master and crew (malefiecium) towards the owner, as relates to the vessel and cargo, The word dolus expresses the meaning attached to the word in England and America better than the word culpa. Cases have existed where the negligence has been so gross on the part of the master as to be deemed and taken as proceeding from a wrongful and injurious intention towards the owner and his interests; and it may be sometimes difficult in practice to, determine where negligence not insured against terminates and where barra-try commences.
We are of opinion that the facts of this case raise no such difficulty; and even if of themselves they would have done so, all such difficulty is removed by the allegations of the plaintiffs in their declaration and replications, that the acts of their master in omitting to repair the boat, to re-ship the cargo, and the act of lashing to and towing, were done honestly by him and, in good faith. The underwriters, therefore, are not, on the ground of the clause against barratry in this policy, to be made liable.
*251 We have deemed it proper todeteraiine this case upon the general grounds above discussed, and have not thought it necessary to examine minutely the questions of special pleading argued at the bar, because we are satisfied that an examination of those questions would not change the result to which we have arrived, but would strengthen the grounds upon which we have seen fit to place the case. The judgment of the éircuit court is therefore affirmed.